IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| BRIAN MCARTHUR; DANTE ANDRY; JOSEPH MCGOWAN; ARTHUR STERN JR., <br><br> Plaintiffs, <br><br> v. <br><br> CITY AND COUNTY OF SAN FRANCISCO; THE SAN FRANCISCO POLICE DEPARTMENT; LEONARD BROBERG; CHRISTOPHER LEONG; ERIC EASTLUND; PATRICK FAYE; PAUL WILGUS; JOSEPH OBIDI; RICHARD RUIZ, <br><br> Defendants. | No. C 15-02164 WHA <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |

**INTRODUCTION**

In this Section 1983 action, defendants move for summary judgment. For the reasons discussed below, the motion is **GRANTED IN PART AND DENIED IN PART**.

**STATEMENT**

The undisputed facts, viewed in a light most favorable to plaintiffs, are as follows. On March 8, 2015, plaintiffs filmed a music video on a playground at the corner of Harbor Street and Northridge Street in San Francisco. Plaintiff Arthur Stern, a musician, had hired plaintiff Brian McArthur to film the music video. Plaintiffs Joseph McGowan and Dante Andry, both rap artists, also performed in the music video. A group of other men joined the filming as

extras. The men interacted in a friendly fashion. In total, about 15 men were involved in filming the scene.

At about 5:15 pm, Officers Christopher Leong and Paul Wilgus, both in plainclothes, observed the group. Officer Leong recognized two of the men to be gang affiliates. He spoke to one of the men and learned that the group was filming a rap video. Based on his experience, Officer Leong believed that performers often display firearms and gang signs during the filming of rap videos. In addition, he knew a recent killing of a gang member had escalated conflict between two gangs in the area. Officers Leong and Wilgus decided to conduct surveillance on the group from a nearby location.

Soon thereafter, Officer Leong observed three men walk down a hill and approach the group on the playground without invitation. Officer Leong observed one of the men, later identified as Taj Williams (not one of our plaintiffs), take out a handgun and chamber a round of ammunition. Then all three men joined the group on the playground. (The parties dispute whether or not the three men arrived together or separately.)

Upon seeing the loaded gun, Officer Leong called backup. Officers Eric Eastland and Patrick Faye, also in plainclothes and working nearby, received the call and quickly arrived on the scene. The four officers, with their police stars visible, approached the group from the rear, pointing their weapons at the men. Officer Eastlund ordered everyone to put their hands in the air. Most of the men, although not all, complied. Officers Leong and Wilgus searched Williams and recovered a loaded gun.

At that point, other officers began arriving on the scene. An officer yelled at the men to get on their knees. The officers placed the men in handcuffs and directed them to sit against a wall. The officers then conducted pat-down searches of each member of the group and identified them. The officers obtained identification from the wallets of plaintiffs McAarthur and McGowan. Officers took pictures of the men to document scars, marks, or tattoos, and physical clothing. Officers took some of the men into custody but eventually released plaintiffs.

1    Plaintiff McArthur's camera, which was rolling when the officers approached the group, continued to film the scene, capturing some, although not all, of the interaction between plaintiffs and the officers.

The parties disagree over the length of the detention. Plaintiffs present evidence that the detention lasted nearly two hours. Defendants present evidence that it lasted less than an hour.

Plaintiffs filed a civil rights action under Section 1983 and state law claiming that they suffered constitutional violations committed by defendants. Plaintiff's complaint alleges false arrest, conspiracy to arrest, malicious prosecution, negligence, and assault. Defendants now move for summary judgment.

## ANALYSIS

Under Rule 56, summary judgment is proper where the pleadings, discovery, and affidavits show that there is "no genuine issue as to any material fact and [that] the moving party is entitled to judgment as a matter of law." A fact is material if it might affect the outcome of the suit under governing law, and a dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A party moving for summary judgment who does not have the ultimate burden of persuasion at trial has the initial burden of producing evidence negating an essential element of the nonmoving party's claims *or* showing that the nonmoving party does not have enough evidence of an essential element to carry its burden of persuasion at trial. *Nissan Fire & Marine Ins. Co. V. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000). The burden then shifts to the nonmoving party to "go beyond the pleadings, and by his own affidavits, or by the 'depositions, answers to interrogatories, or admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).

The court's function on a summary judgment motion is not to make credibility determinations nor to weigh conflicting evidence with respect to a disputed material fact. *See T.W. Elec. Serv. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987). The

evidence must be viewed in the light most favorable to the nonmoving party, and the inferences to be drawn from the facts must be viewed in a light most favorable to the nonmoving party. *Id.* at 631.

### 1. CLAIMS FOR FALSE ARREST AGAINST THE OFFICERS.

The qualified immunity doctrine protects government officials from liability for civil damages "insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). To determine whether an officer is entitled to qualified immunity, the court must consider: (1) whether the officer's conduct violated a constitutional right *and* (2) whether the constitutional right was "clearly established." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). As to the latter determination, the dispositive inquiry is whether it would be clear to a reasonable officer that the conduct was unlawful in the situation he or she confronted. *Id.* at 194-195.

Here, plaintiffs assert two theories of a constitutional violation. *First*, plaintiffs argue that the officers lacked reasonable suspicion for a *Terry* or investigatory stop of plaintiffs. *Second*, plaintiffs argue that the investigatory stop became an arrest requiring probable cause. Each theory is discussed in turn below.

#### A. Reasonable Suspicion for a *Terry* Stop.

An officer may conduct a brief, investigatory stop — a so-called "*Terry* stop" — where the officer has a "reasonable, articulable suspicion that criminal activity is afoot." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). The extent of the intrusion must be "reasonably related in scope to the circumstances which justified the interference." *Terry v. Ohio*, 392 U.S. at 21–22.

The reasonable suspicion standard requires "a particularized and objective basis" and "at least a minimal level of objective justification for making the stop." *Id.* at 120. To determine whether an officer had reasonable suspicion, courts must "look at the totality of the circumstances" of each case. Under this analysis, officers may "draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available" to them. *Ibid.*

4

Here, the officers had reasonable suspicion to conduct an investigatory stop of plaintiffs. The killing of a gang member had set off an escalating conflict between area gangs. The group of men included two gang affiliates. Officer Leong knew that participants often display firearms during the filming of rap videos. Against this backdrop, Officer Leong saw a man approach the group, pull a gun from his waistband, chamber ammunition, and join the group. An objective basis existed for the officers' suspicion that violence seemed imminent and that other men in the group, including plaintiffs, might have a gun. A reasonable jury could not conclude otherwise.

Plaintiffs attempt to demonstrate the existence of a material fact by making the argument that the officers directed Williams into the group — as if Williams were an agent working for the officers. This contention, however, is speculative and without any evidentiary support. Plaintiffs suggest that a video shows Williams nodding his head in the direction of the officers before joining the group. The video relied on by plaintiffs, however, merely shows Williams furtively turning his head to look behind him after joining the group of men (Richardson Decl., Ex 2). A reasonable jury could not conclude based on the video alone that Williams was communicating with the officers. In fact, the video footage comports with the officers' memory of the event. In it, Williams scans the scene nervously — as if he feels vulnerable or expects conflict.

This conspiracy argument backfires for another reason. Plaintiffs contend that the officers created a "dangerous and potentially fatal event" by allowing Williams to enter the group before stopping him (Opp. at 1). Plaintiffs contend the officers delayed their approach in order to have a reasonable basis for searching the entire group. This order rejects this unreasonable inference. *In re Coordinated Pretrial Proceedings*, 906 F.2d 432, 441 (9th Cir. 1990) (at summary judgment stage, a court may refuse to adopt unreasonable inferences from circumstantial evidence). The evidence shows that Officers Leong and Wilgus waited for two additional officers to arrive before approaching the large group on their own. Plaintiffs' argument underscores the delicate calculus faced by officers over public safety. Plaintiffs say the police did too much while also saying the police did not do it soon enough.

The material facts leading up to the detention are not in genuine dispute. This order holds that defendants had reasonable suspicion to conduct an investigatory stop of the entire group, including plaintiffs. Defendants' motion for summary judgment as to plaintiffs' claim that the officers lacked reasonable suspicion is therefore **GRANTED**.

### B. Did the *Terry* Stop Become an Arrest?

Plaintiffs next argue that plaintiffs' detention became an arrest requiring probable cause. To make this argument, plaintiffs attack four aspects of the detention in particular: (1) the intrusive tactics used by the officers, including pointing weapons at and handcuffing plaintiffs; (2) the length of the detention; (3) taking plaintiffs' identifications out of their wallets; and (4) taking pictures of plaintiffs' tattoos.

Defendants do not seek summary judgment that there was probable cause to arrest plaintiffs. Therefore, this order does not address whether the officers had probable cause to arrest plaintiffs. Rather, this order focuses on whether the officers reasonably believed that the tactics used were necessary to protect their safety such that the detention remained a *Terry* stop.

Our court of appeals has explained that "[t]here is no bright-line rule to determine when an investigatory stop becomes an arrest." *Washington v. Lambert*, 98 F.3d 1181, 1185 (9th Cir.1996). A court must conduct a fact-specific inquiry to determine whether the methods used by the officers were reasonable under the "totality of the circumstances." The court must consider the intrusiveness of the tactics and the justification for those tactics. Tactics justified in one set of circumstances might not be justified in another set of circumstances. The inquiry turns on "whether the officer had sufficient basis to fear for his safety to warrant the intrusiveness of the action taken." *Ibid.*

In the course of an investigatory stop, an officer may use tactics to restrain a suspect when the officer reasonably believes force is necessary to protect the officer's own safety or the safety of the public. *Alexander v. Cnty. of Los Angeles*, 64 F.3d 1315, 1320 (9th Cir.1995). Special circumstances might justify the use of "especially intrusive" tactics related to an investigatory stop such as: "(1) where the suspect is uncooperative or takes action at the scene that raises a reasonable possibility of danger or flight; (2) where the police have information

6

that the suspect is currently armed; (3) where the stop closely follows a violent crime; and (4) where the police have information that a crime that may involve violence is about to occur." *Washington v. Lambert*, 98 F.3d at 1185.

### *(1)   Drawing Weapons and the Use of Handcuffs.*

Our court of appeals has recognized that drawing weapons and using handcuffs during the course of a *Terry* stop is not permissible in "ordinary circumstances." *Washington v. Lambert*, 98 F.3d 1181, 1187 (9th Cir. 1996). The court, however, has emphasized that these tactics do not automatically convert a *Terry* stop into an arrest requiring probable cause. *Allen v. City of Los Angeles,* 66 F.3d 1052, 1056 (9th Cir. 1995).

The circumstances here were anything but ordinary. Officer Leong saw Williams load a gun and approach the group of men, looking nervous and furtive. A recent killing of a gang member had intensified conflict between two gangs in the area. Two men in the group were gang affiliates. In addition, Officer Leong knew that people often bring firearms to the filming of rap videos, meaning other firearms might be present. Moreover, not all of the men complied with the request to put their hands in the air.

This order holds that, up until the moment when all of the men had been searched for weapons, the officers reasonably believed that the tactics used were necessary to protect the officers' own safety and the safety of the public. This reasonable belief justified the officers' use of more intrusive tactics, including pointing guns at the group and using handcuffs — at least at first — to maintain officer and public safety. The officers acted with prudence to freeze everything initially until the existence of additional weapons could be ruled out. This order holds that the officers' conduct up through the completion of the pat-down searches did not violate the Fourth Amendment.

### *(2)   The Length of the Detention.*

After the men had been searched, however, factual questions arise as to whether the remainder of the intrusion against plaintiffs was constitutional. In particular, the parties dispute how long the detention lasted. Plaintiffs submit declarations that the detention lasted "nearly

7

1 two hours" (Decl. McArthur ¶ 24; Decl. McGowan ¶ 16). Defendants submit declarations that
2 plaintiffs were detained less than an hour.

3 Defendants contend that a video proves the detention could not have lasted for nearly
4 two hours. The video shows a sky that is still light and, in a deposition, plaintiff McArthur
5 admitted that the passage was filmed after the detention ended. Defendants request, and this
6 order grants, judicial notice of the fact that sunset on the day of the detention on March 8, 2016,
7 took place at 7:10 pm. It seems undisputed that the detention started around 5:30. Thus, the
8 video proves that the detention ended before 7:10 pm and lasted less than an hour and 40
9 minutes. Nonetheless, how much shorter remains in dispute.

10 The length of time is particularly important in light of the apparently undisputed fact
11 that plaintiffs remained in handcuffs for the duration of their detention. "We were sat on the
12 ground against the wall with handcuffs still on for nearly two hours" (Decl. McArthur ¶ 24).

13 To justify the length of the detention, defendants point to a decision by the Sixth Circuit,
14 *Embody v. Ward*, 695 F.3d 577, 580 (6th Cir. 2012), in which the court upheld the
15 reasonableness of a two-and-a-half hour investigatory stop. In *Embody v. Ward,* however,
16 unlike the present case, the suspect was *not* kept in handcuffs for the period of his detention.
17 Moreover, in that case, the suspect himself had engaged in conduct that justified the lengthy
18 delay — the suspect had been conspicuously displaying an AK–47.

19 Here, the plaintiffs themselves had not engaged in suspicious conduct to justify the use
20 of handcuffs for as long as an hour and 40 minutes. The officers knew that plaintiffs had been
21 involved in filming a music video and had observed plaintiffs interacting in an amiable fashion
22 with the other men involved in the filming. Once the men had been searched for weapons with
23 none found, the officers could not reasonably believe that the use of handcuffs with respect to
24 plaintiffs (as opposed to Williams, who had been found with a gun) was necessary to protect
25 their own safety or the safety of the public. Moreover, defendants do not assert, and it would
26 not be reasonable to believe, that probable cause existed for any crime as to plaintiffs.

27 Under *Terry*, the extent of the intrusion must be "reasonably related in scope to the
28 circumstances which justified the interference." *Terry v. Ohio*, 392 U.S. at 21–22. Here, if

plaintiffs were indeed kept in handcuffs for nearly an hour and 40 minutes, the intrusion would not be reasonably related in scope to the circumstances that justified the interference.

\*          \*          \*

Defendants argue that even if a constitutional violation took place, the officers are entitled to qualified immunity. Defendants fail, however, to carry their burden of showing that the officers are entitled to qualified immunity in light of the remaining factual dispute. Under qualified immunity, the dispositive inquiry is whether it would be clear to a reasonable officer that his or her conduct was unlawful in the situation he confronted. *See Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Here, assuming arguendo that plaintiffs remained in handcuffs for an hour and 40 minutes, it should have been clear to a reasonable officer that such a detention was not lawful. *First*, it is well-established that a *Terry* stop must be "brief" in duration and that the extent of the intrusion must be "reasonably related in scope to the circumstances which justified the interference." *Terry v. Ohio*, 392 U.S. at 21–22; see also Florida v. Royer, 460 U.S. 491, 500 (1983) (an investigatory stop must be temporary and last no longer than is necessary to effectuate the purpose of the stop); *Rodriguez v. United States*, 135 S. Ct. 1609, 1612 (2015) (police stop impermissible where it exceeds the time needed to handle the matter for which the stop was made). *Second*, the use of intrusive tactics such as handcuffs must be justified by the circumstances. *Washington v. Lambert*, 98 F.3d at 1185. While the use of handcuffs was justified when officers reasonably believed that a member of the larger group might have a weapon, that justification dissipated once the pat-down searches ruled out the existence of an additional weapon. The suspicions concerning plaintiffs in particular — as opposed to others in the group — were not so great as to justify their detention in handcuffs for an hour and 40 minutes.

Here, the outcome of the qualified immunity analysis hinges on a disputed fact: whether the detention lasted for 38 minutes or for an hour and 40 minutes. "If there are genuine issues of material fact in issue relating to the historical facts of what the official knew or what he did, it is clear that these are questions of fact for the jury to determine." *Sinaloa Lake Owners Ass'n*

9

*v. City of Simi Valley,* 70 F.3d 1095, 1099 (9th Cir. 1995). *See Monteiro v. City of Elizabeth*, 436 F.3d 397, 405 (3d Cir. 2006) ("Although qualified immunity is a question of law determined by the Court, when qualified immunity depends on disputed issues of fact, those issues must be determined by the jury."). Before the issue of qualified immunity can be resolved, a jury must first determine how much longer the detention lasted after the pat-down searches and whether plaintiffs remained in handcuffs during that additional time.

Defendants' summary judgment motion as to plaintiffs' claim that the detention became an arrest is therefore **DENIED**. The jury will be instructed that no constitutional violation took place up through and including the pat-down searches of all of the men. The jury will then be asked to make findings on special interrogatories as to how much longer the detention lasted after the pat-down searches and whether plaintiffs remained in handcuffs during that additional time to guide the court in its analysis of qualified immunity.

### *(3) Taking Identification from Plaintiffs' Wallets.*

As to plaintiffs' claim that the officers impermissibly took plaintiffs' identification from their wallets, this order elects to first examine the "clearly established" prong of the qualified immunity analysis as permitted by *Pearson v. Callahan*, 555 U.S. at 236. Some courts have held impermissible a seizure that included the taking and holding of a suspect's identification. *See United States v. Ienco*, 182 F.3d 517, 525 (7th Cir. 1999). Others have permitted similar conduct. *See United States v. Murphy*, 261 F.3d 741 (8th Cir. 2001); *United States v. Hernandez-Rivas*, 348 F.3d 595, 599 (7th Cir. 2003). The law, as yet, is not "clearly established" that taking identification from a suspect's wallets is impermissible. *Quezada v. Hubbard,* No. C 01-02303 CRB, 2002 WL 1598873, at *4 (N.D. Cal. July 18, 2002) (Judge Charles R. Breyer) ("*Knowles* does not prohibit limited searches for identification prior to a custodial arrest or citation."); *see also* 4 Wayne R. LaFave, *Search & Seizure* § 9.6(g) (5th ed.2015). Therefore, defendants' motion for summary judgment as to the taking of plaintiffs' identification is **GRANTED**.

### *(4)* *Taking Pictures of Tattoos.*

Plaintiffs also argue that the officers impermissibly lifted plaintiffs' shirts to take pictures of their tattoos. In their opposition, however, plaintiffs cite to no evidence that the officers lifted plaintiffs' shirts to take pictures of their tattoos. At oral argument, plaintiffs' counsel also could not point to such evidence. Defendants' motion for summary judgment is therefore **GRANTED** with respect to these claims.

### C. Conspiracy to Arrest.

Plaintiffs contend that officers conspired together to direct Williams into the group in order to justify the subsequent search — as if Williams were working as an agent. This contention is speculative and without support. As discussed above, a reasonable jury could not conclude based on the evidence submitted by plaintiffs that Williams was communicating with the officers. Defendants' motion for summary judgment with respect to plaintiffs' conspiracy claim is therefore **GRANTED**.

### D. Officer Patrick Broberg.

Defendants submit a declaration of Officer Patrick Broberg in which he states that he was not involved in nor aware of the detention of plaintiffs or any of the other men until 7:30 pm on the evening of the incident, at which time he received notification that three of the men (not plaintiffs) had been arrested. Plaintiffs submit no evidence of Officer Broberg's involvement in plaintiffs' detention. Therefore, defendants' summary judgment motion as to Officer Broberg is **GRANTED**.

### E. 2013 Incident.

This order now turns to a wholly separate set of facts involving one of the plaintiffs (plaintiff McArthur). In their complaint, plaintiffs allege that officers subjected plaintiff McArthur to an earlier illegal arrest and a two-day incarceration in 2013 — two years before the events discussed above (Compl. ¶¶ 13–30). In their opposition, plaintiffs fail to cite to any evidence regarding the 2013 incident (Opp. at 15). A review of evidence submitted by plaintiffs also reveals no such evidence. Defendants have therefore met their burden of showing that plaintiffs do not have enough evidence of an essential element to carry their burden of

1  persuasion at trial with respect to the 2013 incident. Accordingly, defendants' motion for
2  summary judgment as to the 2013 incident in general and as to Officers Joseph Obidi and
3  Richard Ruiz in particular is **GRANTED**.

### F. *Monell.*

In *Monell v. Department of Social Services*, 436 U.S. 658 (1978), the Supreme Court established that local governments can be held liable for Section 1983 violations. The inadequacy of police training may serve as the basis for Section 1983 liability but "only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton v. Harris*, 489 U.S. 378, 388 (1989).

Plaintiffs ask the Court to take judicial notice of a prior complaint against Officer Wilgus. The court need not decide whether judicial notice is appropriate because this evidence, on its own, is insufficient to show *Monell* liability. *Haynes v. City and County of San Francisco*, 2010 WL 2991732 at *4 (N.D. Cal. July 28, 2010) (Judge Phyllis J. Hamilton) ("In the context of a city's alleged indifference to its police officers violating constitutional rights of its residents, providing evidence of past complaints against officers is generally insufficient to establish a policy or custom of indifference").

Plaintiffs also submit an SFPD guideline document or policy titled "Guidelines for First Amendment Activities" to support their *Monell* claims (Richardson Decl, Ex. 7). The guidelines require prior approval for investigations regarding First Amendment activities. Plaintiffs argue that SFPD "has direct liability for failing to follow protocol and failing to properly train, supervise, or discipline the officers" (Opp. at 1). This argument is without merit. The policy alone does not support the proposition that SFPD should be directly liable for the conduct of the individual defendants. *First*, the guidelines state that they "are not intended to interfere with investigations into criminal activity" (Richardson Decl., Ex. 7). *Second*, the guidelines seem intended to address situations in which the police are investigating the protected activity itself, like investigating groups that advocate violence or gathering information for scheduled protests. Officers Leong and Wilgus were investigating potential

1    gang violence and, later, a gun possession. *Third,* it is not clear how the existence of these

2    guidelines furthers plaintiffs' argument that a constitutional violation took place.

3    For these reasons, the motion for summary judgment as to the City and SFPD is

4    **GRANTED**.

5    **2.    STATE LAW CLAIMS.**

6    **A.    Negligence and Assault Claims.**

7    California Penal Code Section 847 bars liability for false arrest where an officer had

8    "reasonable cause." Because this order concludes above that defendants had reasonable

9    suspicion to conduct an investigatory stop, defendants' summary judgment motion as to the

10   assault and negligence claims is **GRANTED**.

11   **B.    Malicious Prosecution.**

12   Plaintiffs do not allege or present evidence that plaintiffs were ever prosecuted as

13   required for a malicious prosecution claim. *See Usher v. City of Los Angeles*, 828 F.2d 556,

14   562 (9th Cir. 1987) ("In California, the elements of malicious prosecution are (1) the initiation

15   of criminal prosecution, (2) malicious motivation, and (3) lack of probable cause."). Further,

16   plaintiffs' arguments in support of their claim for malicious prosecution are confusing and hard

17   to decipher (Opp. at 12). Plaintiffs appear to contend that the picture-taking and compiling of a

18   gang task force file support their claim for malicious prosecution. Plaintiffs cite to no authority

19   for that proposition. Defendants' motion for summary judgment as to the malicious prosecution

20   claim is therefore **GRANTED**.

21   **3.    EVIDENTIARY ISSUES.**

22   Defendants argue that the court should disregard the report of plaintiffs' expert, Roger

23   Clark. A scheduling order set the following dates for expert disclosures: designation of experts

24   and disclosure of full reports by March 31; opposition reports by April 14; rebuttal reports by

25   April 21 (Dkt. No. 19). On April 21, plaintiffs served a "supplemental disclosure" that listed

26   Roger Clark as a police practices expert. Plaintiffs did not provide the report at that time.

27   Rather, defendants only became aware of the report when plaintiffs submitted it with their

28

13

1  response on May 9. Plaintiffs have not yet attempted to show good cause for or explain the

2  delay. As such, plaintiffs' expert report will be disregarded on this motion.

3  With their opposition, plaintiffs improperly filed confidential documents without an

4  accompanying motion to file under seal as required by the protective order (Dkt. No. 29) and

5  the local rules. An earlier order concluded that these documents would be disregarded absent

6  an appropriate motion to seal pursuant to the local rules. Plaintiffs have not filed such a motion.

### 4. Rule 56(d) and Request for Sanctions.

Plaintiffs ask the court to re-open discovery and to sanction defendants for discovery violations. Among other complaints, plaintiffs contend that defendants failed to provide a privilege log until after the close of discovery. Without much explanation, plaintiffs also contend that defendants failed to turnover a tape that was referenced in a news article. Plaintiffs have not provided enough information to help the Court understand why discovery should be re-opened pursuant to Rule 56(d). As such, plaintiffs' request to re-open discovery is **DENIED**. Plaintiffs' request for sanctions is also **DENIED**.

### CONCLUSION

For the reasons discussed above: defendants' motion for summary judgment as to plaintiffs' claim for false arrest related to the March 2015 incident is **GRANTED IN PART AND DENIED IN PART** to the extent described above; defendants' motion for summary judgment as to the conspiracy claim is **GRANTED**; defendants' motion for summary judgment as to the May 2013 incident is **GRANTED**; defendants' motion for summary judgment as to the claims against officers Ruiz, Obigi, and Broberg is **GRANTED**; defendants' motion for summary judgment as to the City and SFPD is **GRANTED**; defendants' motion for summary judgment as to plaintiffs' claims for negligence, assault, and malicious prosecution is **GRANTED**; plaintiffs' request to re-open discovery is **DENIED**; plaintiffs' request for sanctions is also **DENIED**.

Partial summary judgment is further granted as follows. The jury will be instructed that no constitutional violation took place up through and including the searches of all of the men. That issue is now decided and will not be re-litigated at trial but of course sufficient background facts may be allowed so that the jury may decide liability, if any, for the events thereafter. In

addition, the jury will then be asked to make findings on special interrogatories as to how much longer the detention lasted after the pat-down searches and whether plaintiffs remained in handcuffs during that additional time to guide the Court in its analysis of qualified immunity.

**IT IS SO ORDERED.**

Dated: June 6, 2016.



WILLIAM ALSUP
UNITED STATES DISTRICT JUDGE